SO ORDERED.

SIGNED this 30th day of October, 2018.



Dale L. Somers
United States Chief Bankruptcy Judge

___

Designated for online use, but not for print publication
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In Re:

Walter Frank Rudolph and
Pansy Joan Rudolph,

        Debtors.

Case No. 18-40423
Chapter 12

## Memorandum Opinion and Order Sustaining in Part the Objection of First Commerce Bank to Debtors' Exemptions

Debtors Walter and Pansy Rudolph both claimed the full Kansas exemption for tools of the trade, even though during the year before they filed for protection under Chapter 12 they significantly reduced their farming operations. First Commerce Bank, Debtors' lender who claims a perfected security interest in Debtors' farm equipment, objects and contends that Debtors have so reduced their operations that they are not entitled to claim the tools of the trade exemption, or, if they are still engaged in farming as

their primary occupation, a portion of the property claimed as exempt is not regularly and reasonably used to carry out the remaining farming operations.[1]

Trial was held on September 20, 2018.[2] The Court finds that although Debtors have ceased row crop farming, they are continuing to actively engage in ranching and farming activities such that they are entitled to claim the tools of the trade exemption for farm tools and machinery, and most of the items they claim as exempt tools of the trade are regularly and reasonably necessary to carry out their ranching and farming operations.

I.  **Findings of Fact**

---

[1] Doc. 33. First Commerce Bank also claimed that the actual value of the property claimed as exempt exceeds the limitation imposed by Kansas law, but trial on that issue was deferred.

[2] Debtors appear in person and by their attorney, Tom R. Barnes II, of Stumbo Hanson, LLP. First Commerce Bank appears by Kenneth Steinfort and by its attorney, Kevin J. Grauberger of Riordan, Fincher & Beckerman, P.A. The Chapter 12 Trustee, Carl B. Davis, appears by telephone.
    This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure (March 2018). A motion objecting to exemptions is a core proceeding which this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(B). There is no objection to venue or jurisdiction over the parties.

Debtor Walter Rudolph started farming in 1948, when he was very young, and continued farming throughout his adult life. He and Pansy have been married for 32 years. Pansy was employed by Marshall County from 1986 through 2007. Since December 31, 2007, she has worked exclusively at the farm. Debtors receive income from Social Security and KPERS.

Pansy testified of the many farm functions that she performs. First Commerce Bank (the Bank) has not challenged that, if Walter is engaged in ranching and farming and eligible to exempt farm implements as tools of the trade, Pansy is also entitled to claim the exemption.

Debtors' homestead contains 17 acres. A portion is used to raise a forage crop for livestock, and a portion is a hay meadow that is harvested for livestock or grazed. Debtor Walter Rudolph also has possession of three tracts of farm land owned by two trusts established by his parents, comprised of approximately 200 acres, 80 acres, and 186 acres. As to the 200 acre farm, referred to as the Blue Rapids Farm, 140 acres are crop land, 10 acres are a hay meadow, and approximately 60 acres are pasture. Approximately 35 acres of the 80 acre farm (the Riley Kansas Farm) are cultivated, hay is harvested from 40 acres, and 3 to 5 acres are subject to a Conservation Reserve Program (CRP) contract. As to the 186 acre tract, hay is harvested

3

from the portion not rented for pasture. Debtor is obligated by the trusts to maintain the trust land.

As of 2014, Debtor farmed and ranched on the trust land and also rented additional land. He raised wheat, oats, corn, soybeans, and alfalfa on 300 to 400 acres. He also raised his own cattle on 300 to 400 acres. In 2017 he started to farm fewer acres. In 2017, on the 200 acre farm Debtor planted grain, corn, and forage wheat. He ran his own cattle on the grazing land. On the 80 acre farm, he harvested hay and took care of the CRP land, but rented out the crop land. The cattle on the 186 tract were owned one half by the Debtors.

The Bank financed Debtor's farming operation and was granted a security interest in Debtors' farm equipment.[3] The loans matured in about November 2017, and the Bank wanted to be paid. In July 2017 Debtor Walter Rudolph submitted to the loan officer a sale schedule, showing liquidation of livestock and equipment from September 1, 2017 through March, 2018. Kenneth Steinfort, the loan officer who took over the account after the retirement of the officer formerly in charge, met with Walter Rudolph in late

---

[3] At trial, Debtors' counsel questioned whether the Bank's security interest in equipment was properly perfected when the Chapter 12 case was filed, or had perhaps been preferentially perfected. That perfection issue is not before the Court for decision.

4

2017 and early 2018. Walter Rudolph presented a 2018 budget. It shows farming expenses of approximately $1000 and no farm income other than annual land rent. In late 2017 or early 2018 Walter Rudolph provided the Bank with a list of farm equipment to be retained and a list of items to be sold by the summer. The property to be retained includes some but not all of the property claimed as exempt. Only one item in the list of equipment to be sold, a Case 870 tractor, is being claimed as exempt. Kenneth Steinfort understood that Debtors were retiring from farming and were going to rent the land owned by the trusts to third parties.

Walter Rudolph testified at his 341 hearing that he had "quit farming."[4] The trial testimony clarified his statement. Both Pansy and Walter Rudolph testified that as of 2018, Debtors are no longer growing row crops, but they are caring for cattle on the pastures described above, are harvesting hay and planting forage crops to feed cattle and horses, are maintaining the farm land owned by the trusts, and are performing the functions required for the 3 to 5 acres in the CRP program. Debtors stopped growing row crops because the profit margin was too thin, but Debtors have not ruled out the possibility of again growing row crops for harvest and sale.

---

[4] Exh. G (Transcript of § 341 meeting) at 13, ll.18-19 and 24, ll.20-22.

In 2018, the crop land portions of the 200 acre and 80 acre farms are rented to third parties who plant and harvest crops. At the Blue Rapids Farm, in some years, Debtors plant a wheat or barley crop after the tenant harvests the fall crop, but Debtors would use these crops to feed cattle and horses. At other farms as well, Debtors use the harvested hay for cattle and horses. The grazing land is rented to third parties who place their own cattle on the properties, but Debtors maintain the fences and provide minerals, salt, and care for the cattle. Debtors vaccinate the cattle and provide ear tags and castration for the calves, as warranted. Debtors inspect the grazing land and cattle about twice a week, and any lame or sick cattle are doctored in place, herded to a coral, or taken to a veterinarian for treatment. Debtors maintain the ground subject to the CRP contracts and generally spray for noxious weeds and perform brush and tree control. On Schedule I Debtors estimated $976.98 as their net monthly farm income. Debtors' Chapter 12 Plan projects annual gross farm income of $21,364, $20,800 of which is rental income.[5]

Debtor Walter Rudolph testified as to the use of each of the items of personal property claimed as exempt tools of the trade. The values stated are

---

[5] Doc. 2 at 13.

Debtors' estimates from their Schedule C.[6] The total claimed value does not exceed that allowed by Kansas law. The exemption items and their claimed value are:

| Item | Claimed Value | Location | Use | Last Used |
|---|---|---|---|---|
| Donahue combine trailer | $500 | Blue Rapids Farm | Haul supplies, including hay | August 2018 |
| 5x14 stock trailer | $50 | Blue Rapids Farm | Trash placed in trailer and then hauled to the dump | Continuous |
| Tripp two-horse trailer | $800 | | Used to haul horses and calves | Two weeks before trial |
| Titan 18 foot stock trailer | $1000 | Blue Rapids Farm | Used to haul cattle owned by lessees to pasture that Debtors lease to cattle owner | July 2018 |
| Seven mares and geldings aged 20 to 30 years; saddles, bridles, halters, and miscellaneous tack; horse feed | $1000; horse saddles, bridles, halters and miscellaneous tack ($800); bales of prairie and wheat hay used to feed horses ($330) | Horses are kept at the Blue Rapids Farm or the 17 acre homestead | Debtors regularly use the horses to work the cattle on the rented pasture land. The horses are the eighth generation of horses raised by Debtors. Different family members claim certain of the horses, but Walter Rudolph claimed all of them as exempt because they are in his possession. | Continuous |
| MM 670 farm tractor | $3000 | Blue Rapids Farm | Has loader; used to move dirt and clean corrals | 2018 |
| Case 870 tractor | $3000 | Riley Farm | Used to move hay and work on farm, such as spraying | July 2018 |
| Rino rotary mower | $1000 | Blue Rapids Farm | Used to mow weeds | Few days before trial |

---

[6] The Bank's challenge to Debtors' valuation was reserved pending resolution of whether Debtors are engaged in farming as their primary occupation and, if so, whether the property claimed as exempt is regularly and reasonably used to carry out the Debtors' farming operations.

7

| 100 and 200 gallon tanks | $50 and $100 | Blue Rapids Farm | The 100 gallon tank is used to heat water and the 200 gallon tank is used to store propane fuel for the MM 670 tractor | Continuous |
|---|---|---|---|---|
| Miller offset disc | $500 | Blue Rapids Farm | Used to till before planting | July 2018 |
| Oliver 4x6 plow | $200 | Riley Farm | Used to rebuild terraces | |
| Home made bale forks and miscellaneous hand and mechanics tools | $300 and $500 | Blue Rapids Farm (majority) | | |
| Miscellaneous salvage farm equipment | $300 | Any of four farms | | |
| Farmhand model 228 loader | $500 | Blue Rapids Farm | Attached to the MM670 tractor | |
| DC Case farm tractor | $500 | Blue Rapids Farm | Small tractor used to bring in hay and spraying in the early summer | Summer 2018 |
| Miscellaneous feed bunks and hay feeders | $300 | Blue Rapids Farm | Located in pastures and used to feed horses and cattle | Continuous |
| 25 gallon chemical tank with pump and spray wand | $50 | Blue Rapids Farm (may have been stolen) | | |
| Portable loafing shed | $100 | | Used for cattle | |
| Grain for horses and calves | $60 | | Already consumed | |

Each tractor has a specific function. Debtors' farms are about 30 miles apart and it would take about two or three hours to move tractors from one field to another. Generally, when selecting which equipment to retain and

8

which to turn over to the Bank, Debtors elected to retain equipment of lesser value that will function to the extent needed. For example, Debtors turned over to the bank a larger, more modern New Holland tractor, while claiming some smaller tractors as exempt. In addition, Debtors' proposed Chapter 12 plan provides that they will retain four nonexempt tractors, valued at $4,300 by paying First Commerce their value in ten semi-annual payments, with interest.

Debtors' schedules of Business Income and Expenses reports that estimated average future gross monthly income is $1,780.33, down from $43,030 annually or $3,586 per month for the previous 12 months. Debtors' Chapter 12 plan details their projected income from farming as $21,364 annually, comprised of $420.00 from CRP grass, $144 from the Kansas Water Commission, and $20,800 farm rent. Debtors' Schedule of Business Income and Expenses lists monthly expenses of $810.02, comprised of $333.33 for taxes, $183.33 for purchase of feed/fertilizer/seed/spray, $50 for utilities, $50 for repairs and maintenance, and $163.36 for insurance. Net projected monthly income is therefore $970.31.

II. Analysis

    A.    **The applicable law.**

Section 522(b)[7] provides that a debtor may take the exemptions enumerated in § 522(d), unless applicable state law specifically provides otherwise. Kansas has opted out of the federal exemptions[8] and has enacted its own set of exemptions. Debtors claim the foregoing farm equipment exempt under K.S.A. § 60-2034(e), the Kansas tools of the trade exemption. It provides:

> Every person residing in this state shall have exempt from seizure and sale upon any attachment, execution or other process issued from any court in this state, the following articles of personal property:
> \* \* \*
> (e) The books, documents, furniture, instruments, tools, implements and equipment, the breeding stock, seed grain or growing plants stock, or the other tangible means of production regularly and reasonably necessary in carrying on the person's profession, trade, business or occupation in an aggregate value not to exceed $7,500.

The Bank objects to the exemptions asserting that: (1) Debtors are no longer actively engaged in farming or ranching as their primary trade or occupation and are therefore not eligible to claim the exemption; (2) to the extent Debtors continue some amount of farming operations, at least some of the equipment claimed as exempt is not regularly and reasonably necessary to carry out the

---

[7] 11 U.S.C. § 522(b). References to Title 11 in the text shall be to the section number only.

[8] Kan. Stat. Ann. § 60–2312. In the text, K.S.A. shall be used to refer to the Kansas Statutes.

remaining operations; and (3) if Debtors are allowed some property as exempt tools of the trade, the actual value of the property claimed as exempt exceeds the limit of Kansas law. The third issue is reserved for future decision after a ruling on the first two issues.

The fact that Debtors are eligible for Chapter 12 does not mean they are entitled to exempt farm equipment as tools of the trade. The definition of family farmer, which determines eligibility for Chapter 12, concerns debt and income for the year preceding the year of filing.[9] Entitlement to exemptions is determined as of the date of filing.[10] Kansas "exemption laws are to be construed liberally in favor of exemption."[11] Once an exemption is claimed, the burden of proof is on the objecting party to prove that it is not properly claimed.[12]

The statutory language of the tools of trade exemption has been construed to require four elements: "(1) the person claiming the exemption must reside in Kansas; (2) the person must have a business or occupation; (3)

---

[9] 11 U.S.C. § 101(18)(A).

[10] *Lampe v. Iola Bank and Trust (In re Lampe)*, 278 B.R. 205, 210 (10th Cir. BAP 2002).

[11] *Lampe v. Williamson* (*In re Lampe*), 331 F.3d 750, 754 (10th Cir. 2003) (quoting *In re Ginther*, 282 B.R. 16, 19 (Bankr. D. Kan. 2002)).

[12] *In re Kieffer*, 279 B.R. 290, 294 (Bankr. D. Kan. 2002).

11

the items claimed exempt must be tools, implements and equipment, or other property that are tangible means of production; and (4) the items claimed exempt must be regularly and reasonably necessary in carrying on the person's business or occupation."[13]  In this case, there is no dispute that elements one and three are present. The controversy is over elements two and four.

>    B.  **Debtors were engaged in farming and ranching on the date they filed for Chapter 12 protection and are eligible for the Kansas tools of the trade exemption.**

Although Debtors no longer plant and harvest row crops, they are engaged in ranching and other farming activities.  They perform all functions necessary to care for the cattle grazed on the rented pasture land, they harvest hay, and they plant forage crops to feed cattle and horses. In addition, they maintain the farm land owned by the trusts, and perform the functions required for the 3 to 5 acres in the CRP program.

Debtors' social security and KPERS benefits comprise the majority of their income. But this does not disqualify them from claiming exemptions for their farming business occupation, since entitlement to the exemption does not require that farming be their exclusive and sole means of making a living.[14]

---

[13]  *In re Kobs,* 163 B.R. 368, 372 (Bankr. D. Kan. 1994).

[14]  *Id.* at 373.

Debtors do not produce crops for sale or own and raise cattle for sale, but the Kansas tools of the trade exemption does not require that the exempt tools be used to produce something for sale.[15] In addition, there is nothing in the Kansas exemptions which requires a farmer to "farm his own property for himself;"[16] rather a debtor who actually engages in farming activities for a landlord's share of crops is entitled to the exemption.[17] Here Debtors are entitled to the tools of trade exemption because they are actually engaged in caring for cattle owned by others being grazed on land rented to them by Walter Rudolph, as beneficiary of two trusts. Debtors also perform other farming operations, including complying with CRP requirements for the land in the program, maintaining the crop land, raising forage crops, and harvesting hay for feed.

### C. The Court rejects the Bank's argument that Debtors are not eligible for the exemption because evidence that they have "quit farming" outweighs their trial testimony.

The Bank argues in its post trial brief[18] that Debtors are not entitled to the tools of trade exemption because they were not actively engaged in

---

[15] *Hamilton v. MacMillan (In re MacMillan)*, 546 B.R. 213, 216 n.1 (D. Kan. 2015).

[16] *In re Massoni,* 67 B.R. 195, 197 (Bankr. D. Kan. 1986).

[17] *Id.*

[18] Doc. 56.

13

farming as their primary trade or profession as of the petition date. It submits that the Debtors' trial testimony that they are engaging in farming activities is inconsistent with and insufficient to overcome Debtors' contrary representations. As shown by the following analysis, the Court rejects the Bank's arguments and finding no inconsistency—Debtors have, at least temporarily, retired from crop farming, but not from ranching and caring for agricultural land.

When Walter Rudolph met with Kenneth Steinfort, the Bank's loan officer in 2017 and early 2018 to discuss a plan to repay his debt, the officer understood that Debtors were retiring from all farming activities. In support, he testified about schedules prepared by Walter Rudolph of livestock and farm equipment to be sold and estimated income and expenses for 2018. It is true that these documents are consistent with Debtors' full retirement. Only a few items of equipment are on the list of items to be retained, and the budget shows no income from sale of farm products. But the documents are also consistent with Debtors' trial testimony. There would be no reason for Debtors to retain the tools on list of items not to be sold, such as a tractor, a drill, and a plow, if Debtors were going to totally withdraw from farming. Only one of the many items identified for sale, the 870 Case tractor, is being claimed as exempt. Likewise, a budget showing only two sources of income,

14

benefits (social security and KPERS) and annual land rent, is consistent with the reduced farming activities in which Debtors testified that they are engaged.

The Bank argues that Debtors' bankruptcy schedules and their Chapter 12 Plan show that they were not actively engaged in farming on the petition date, but again the Bank points to nothing contradicting the Debtors' testimony and the Court's conclusion that Debtors' were engaged in farming on the date they filed for bankruptcy relief. Debtor's Statement of Business Income and Expenses,[19] reports 2017 annual gross income of $43,030 and estimated 2018 gross income of $21,364. Debtors' Chapter 12 Plan projects $21,364 in annual farm income, $20,800 of which is for rent.[20] The Bank argues that these financial projections show Debtors have no "plans or intentions of generating any substantial amount of income from actively farming."[21] But these projections are consistent with Debtors' testimony that they plan to engage in farming and ranching, comprised of caring for the trust property and providing care of the cattle on the rented grazing land.

---

[19] Doc. 1 at 59.

[20] Doc. 2 at 13.

[21] Doc. 56 at 8.

15

Likewise, Walter Rudolph's testimony at the § 341 meeting that he had retired from farming is not inconsistent with his trial testimony. At that meeting the term farming was not explained. At trial it became apparent that Debtors are retiring from row crop farming and raising their own livestock, but they are not totally withdrawing from caring for the land entrusted to them and care for cattle grazed on the rented trust owned property. As examined above, the Court finds these reduced farming and ranching activities constitute a trade or business for purposes of the Kansas tools of the trade exemptions.

### D. A few items of property Debtors claim as exempt are not regularly and reasonably necessary for the farming operations they intend to perform.

In the alternative, the Bank contends that if Debtors are eligible for the tools of the trade exemption, not all of the items claimed are regularly and reasonably necessary for their farming activities. They specifically focus on the exemption of three tractors and seven horses, together with related equipment.

The Court finds that Debtors may exempt the three tractors. "To fall within the exemption, the property need not be indispensable. It is enough that the property is reasonably necessary, convenient or suitable for the

production of work."[22] Walter Rudolph testified that multiple tractors were claimed as exempt because they serve different functions and because of the distance between the farms. Moving a tractor from one farm to another would take two to three hours, so he finds it convenient to have a tractor at each location.[23]

The Court however agrees with the Bank that not all seven horses are within the definition of tools of the trade. Walter Rudolph testified that both he and Pansy ride a horse when inspecting pasture land and cattle. However, this means that only two horses are actually used by Debtors. The horse trailer used to move the horses to the pasture being inspected, the two horses, and the horse saddles, bridles, halters, and miscellaneous tack used for these two horses are tools of the trade. The exemption is not properly claimed for the other five horses, which Debtor indicated were claimed by

---

[22] *In re Frierson*, 15 B.R 157, 159 (Bankr. D. Kan. 1981) (citing *Reeves v. Bascue*, 76 Kan. 333, 91 P. 77 (1907)).

[23] The Bank's argument that fewer than three tractors are entitled to the exemption is based in part upon the fact that Debtors propose in their Chapter 12 plan to pay the Bank the amount of its lien on three additional tractors. How Debtors propose to deal with nonexempt assets is not relevant. There is nothing in the tools of the trade exemption comparing the tools claimed as exempt with tools available from another source. The exemption requires that the exempt tools be regularly and reasonably used in the debtors' trade or business. Debtors have satisfied that requirement.

17

other family members, and the saddles, bridles, halters, and miscellaneous tack associated with them.

### III. Conclusion

The Court rejects First Commerce Bank's objection to the Debtors' claim of exemption of farm equipment as tools of the trade under Kansas law. Although Debtors have retired from growing and harvesting row crops for sale and raising their own livestock, they have not totally retired from farming and ranching. They perform all functions necessary to care for the cattle owned by others grazed on the rented pasture land, they harvest hay, and they plant forage crops to feed cattle and horses. In addition, they maintain the farm land owned by the trusts, and perform the functions required for the 3 to 5 acres in the CRP program. With the exception of five horses and related tack, all of the equipment claimed as exempt comes within the Kansas definition of tools of the trade. The Bank's objection to the valuation of the exempt property will be determined in a separate proceeding, unless the parties reach agreement on this issue.

**It is so Ordered**

### ###